The next matter is number 171364, United States v. Juan Jose Tull-Abreu. Thank you. Mr. Buckeye. Good morning again, Your Honor. You will have to speak up and into the microphone. Okay. Good morning again to everybody. Please, I would like to request one or two minutes for a rebuttal. You may have two minutes. Two minutes. Thank you. The situation in this case mostly is that I consider that the defendant was not allowed to present his defense during trial. It was a 14-day trial, and all the situation, all the time he expressed his desire to say his side of the story of what happened, to explain. And the prosecutor and the district court judge, in my opinion, and according to what I see in the record, what I read, did not allow this to happen. Counsel, the record indicates that your client, out of the presence of the jury, was advised by the judge of what the implications would be if he were to testify. Yes. The government asked him to do that, to be sure that the defendant fully understood what it meant if he were to testify, and then he was given about 30 minutes to talk to his lawyer, and only then, after consulting with counsel, did he make the decision to not testify. How, in that scenario, can you suggest that the court was somehow complicit in denying your client the right to present his side of the story? Two things. First, you are right, it was in 30 minutes he had to confer with his attorney. But these were 14 days of trial, day after day, when, from the record, I was not attorney at trial, but from the record, when I gathered from my reading the record, the balance seemed a little bit tipped against the defendant. Most of the objections that defense counsel raised were denied. All the time that the defendant said, in more than four occasions, that he wanted to explain his side, it was denied. But the prosecutor intervened and molested the defendant, all the harm that he was going to suffer if he decided to take a stand. And so for this reason, I think that... Is your argument that it was improper for the prosecutor to raise the issue of the defendant being aware of the jeopardy he might put himself into if he were to testify? Is that the argument? Yes, basically, that's it. Basically, I think that, as he mentioned, he filed a sworn statement after, as he mentioned, that he felt intimidated, threatened. As I said, 14 days had gone by, and the defendant, who obviously is not a lawyer, is a doctor, saw that everything was going against him. The objections from his lawyer, it was going nowhere. So because the judge ruled against his evidentiary objections, and because the prosecutor asked that he be warned about the consequences of perjury should he testify, you say your client was intimidated, and a discussion of his actual risks with his lawyer for half an hour somehow rendered his decision involuntary? Yes, that's what he expressed in his sworn statement, and that's what I gathered from the record and what happened during the 14 days in the record. Counsel, you want to say a word about your aggravated identity theft argument, which you focus on in your brief, but why do you think the statute did not apply on the facts of this case? Okay, because according to the case of Verroa, there were four situations that Verroa decided. One about the use, the term use that the Supreme Court had already stated that it was ambiguous in the case of Bailey. And this court analyzed that also, which is related to that, the principle of vanity in case of when the... Counsel, factually what happened here, didn't the defendant secure the signatures of some of his patients on blank forms, which were then later submitted seeking reimbursement for office visits that never took place? Isn't that factually what happened here, is that correct? Seemingly, since he did not have the chance to explain during his term what actually happened. Even then, Verroa states that he... As a person, it's out of the scope of the legislative intention, the legislative history. Thank you. Okay, thank you. You have your two minutes. Mr. Lang. Thank you. Good morning, Your Honors, and may it please the Court. Andrew Lang for the United States. Dr. Talbrae submitted CMS 1500 forms to Medicare Advantage insurance plans to bill for office visits that had never taken place. And every time he did that, he used a specific patient's means of identification within the meaning of use that this Court set out in Verroa. Additionally, he routinely post-dated prescriptions for Percocet when he was planning to travel internationally. And that formed the basis for these convictions, which we're asking this Court to affirm. Unless this Court... Counselor, he didn't... I mean, he didn't really... he didn't appropriate the identity of another individual. I mean, he did not attempt to pass himself off as somebody else, which at least is one form of conduct that is covered by the statute. But I gather, at your position, that's only one type of situation that is subject to the statute. Your position here is that he nevertheless used the identity of his patients, securing their signatures on these blank forms, and then submitting claims for reimbursement for office visits that never occurred. In that sense, he was using their identity. Is that correct? That's exactly right, Your Honor. And it's never been our position that he put himself in the shoes of a patient or tried to impersonate a patient in sort of a classic identity theft sense, where somebody might be applying for a Percocet. I understood you to be relying on the second definition in Baroah Reviews to take some other action on another person's behalf. Is that correct? That's exactly right, Your Honor. That is the portion of Baroah that we're relying on. So when he submitted the CMS 1500 forms, he was indeed taking an action on his patient's behalf, at least in part. And indeed, you had testimony from a patient that he never would have authorized the use of the 1500 form to obtain reimbursement for an appointment he never had.  No, no, no. That's not well, certainly. It seems to me that is necessary proof for the government, and you only provided it for one patient. Well, a couple of responses to that, Your Honor. First of all, I don't know that it is necessary that the patient not provide permission for the use of their identifying information. Of course, this wasn't an issue that came up in the briefing, but this court has held it. Admittedly, he didn't raise that issue, but there is a sort of generalized sufficiency of the evidence notion here. Of course, Your Honor. I'm not trying to dispute that. I'm simply going to refer to a case that we didn't cite in our briefing, which is United States v. Ozuna Cabrera, 663 F. 3rd 496. Yes, I'm familiar with it. Yes, Your Honor, and I think that goes to the issue of whether his conduct satisfies the without lawful authorization language in 1028A. And Ozuna Cabrera explained that without lawful authorization doesn't necessarily mean without authorized permission. It means absent the right of permission to act on that person's behalf in a way that is not contrary to the law. So even if the patients had been complicit... So the throwing out of the dates of the supposed visits, in your view, takes care of that issue? The fact that the doctor and his secretaries did that? Yes, Your Honor, that coupled with the fact that they were representing on behalf of the patient, that the patient consented to the assignment of benefits for this fictitious office visit. So for those reasons, the use here is well within the definition in Baroah, and it's consistent with Michael, which is the most recent in this line of cases out of the Sixth Circuit, where the facts are really very similar. A pharmacist was submitting claims for reimbursement for prescriptions that were fraudulent and was representing that they were for a particular patient and issued by a physician. On the conspiracy counts, who's the conspiracy with? So the conspiracy is with the secretaries. How do I know that? Because the indictment doesn't identify them, and the jury instruction doesn't identify who it's with. So is it the patient's particular...? It just seems an odd way to proceed. There's lots of different actors out there, and there's really no guidance as to who he's supposedly agreeing to do this with. It's true that the indictment and the jury instructions didn't specify other co-conspirators, but there was arguably overwhelming evidence at trial that he was conspiring alongside his secretaries to carry out the fraudulent scheme. His secretaries testified that they worked together to assign random dates. They actually had... Does that mean they agreed? Well, the existence of an agreement, as we explain in our supplemental brief, can be inferred from a course of conduct and a working relationship over a period of time. It doesn't have to be explicit, and we accept that no one testified, I agreed with Dr. Tulip Ray to carry out this fraud, but certainly the jury could have inferred... Did the government argue that to the jury, that that was who he agreed with? The government, in closing, argued both that he had agreed with the secretaries and also with some of his other patients, some of whom apparently may or may not have known that their identifying information was being used, and they were benefiting because they didn't have to pay co-pays when they went in to pick up Percocets and things like that. And that could be agreement? That could, Your Honor, yes, and that could also form a basis for the finding of the conspiracy. How long did the secretaries work with him on this fraudulent scheme? I don't have the exact dates in front of me. The total period, I believe, was about four years, from 2009 to 2013. Some of the secretaries were in there for shorter periods, and I think a couple of them overlapped, but I don't know the exact dates of their employment, Your Honor. What was the longest period any of the secretaries he could have agreed to with worked? I believe less than two years, but I hesitate to commit to something. I'm not sure with the record in front of me. But again, that said, I think the evidence was sufficient to support the conclusion that he did have, albeit an implicit, agreement with his secretaries and also with his patients to carry out the fraudulent scheme. Counsel, I thought the posse brief seems to express the position that these were employees, they were subordinates, they were simply ordered to do something, and they did it. As subordinates ordered to do something by their boss, that doesn't rise to, it doesn't constitute an agreement. What's wrong with that argument? Well, a couple of things, Your Honor. First of all, the mere fact that there may be a hierarchical relationship or a power dynamic in a criminal conspiracy does nothing to defeat the finding of a conspiracy. And here, there wasn't any evidence that the secretaries... That's typically when, I mean, like in a drug case, where the subordinate has entered into unlawful conduct to begin with, but this, being a secretary, isn't unlawful. That's a fair point, Your Honor. But the point I'm trying to make is that the fact that they worked for him doesn't mean it was impossible for them to agree with him to carry out the health care fraud. No, it's just a matter of what kind of evidence one needs. And so, I guess the concern is if you're doing it just on the course of conduct, and the course of conduct is just doing the ordinary things a secretary does, then to infer that that shows that they agreed on it. So, is there any evidence about the secretary's knowledge of the fraudulence of any of these papers that were being passed, etc.? Yes, there is, Your Honor. And the secretaries who testified explained that they collected the CMS 1500 forms aware of what they were doing and what their role was in the scheme. And they also testified that they had to take independent steps to find more dates to use because insurance companies were getting suspicious. So, certainly, there is evidence of that. And didn't they keep a log of the dates that had been used before so that they could avoid repeating those dates? Yes, exactly. They did that, Your Honor, as well. And who did that, the secretaries or the doctor? The secretaries maintained those records, Your Honor. I do, in my time remaining, want to briefly touch on the Rule 33 argument, which was Mr. Mercari-Grillo's primary emphasis. There isn't a basis in the record to conclude that Tulebraeu didn't make a voluntary decision not to testify. The district judge went out of his way to conduct a colloquy with Dr. Tulebraeu to ensure that he understood the rights that he was giving up. And then at the end of that colloquy, he had an additional about 30-minute period to consult with his attorneys, came back on the record, and then announced that he had decided not to testify. There's never been an allegation dating back to the Rule 33 motions in the district court that anything the district judge told Dr. Tulebraeu was inaccurate. The issue seems to be with the tenor or the tone of the interaction. And, again, especially on this cold record, there's just no basis to conclude that it was threatening or coercive. So particularly given the standard of review, which is deferential to the judge who had his finger on the pulse of the ebb and flow of the trial, the sensible result here is to not disturb his ruling on the Rule 33 motion. His emphasis was less on the district judge than what he thought was a threatening intervention by the prosecutor, and that this somehow went beyond the rules of propriety. What is your response? Well, I would respond that there's no basis for that conclusion either. The prosecutor addressed only the judge, and the prosecutor said, I want to make sure, I'm obviously paraphrasing, I want to make sure that there's a record that he knows what he's giving up. The district judge agreed. Tulebraeu didn't interrupt except to say he wanted to speak to his attorneys, which he was allowed to do. His attorney didn't interrupt except to make sure that other participants could finish what they were saying. So it was somewhat unusual. I mean, very often judges, when a defendant has made the decision not to testify, there will be a request that there be a copy on the record in which the defendant indicates that he understands he has a right to not testify. The prosecution is often concerned that that be a knowing and voluntary decision. It's pretty unusual. I don't remember seeing this before when the defendant has made a decision to testify that the prosecution will ask that there be an on-the-record copy to be sure he understands the implications of testifying. I've never seen that before. Pretty unusual. I know it's not on the record, but I'm interested in your experience. Is this typically done? I take your point, Your Honor. I agree that this is a little unusual, and I can represent, although this is not on the record either, that I think one of the concerns animating the AUSA, having spoken with her about this issue, was that at the time of trial there were pending tax charges in Puerto Rico court, and there was at least the strong possibility that he could have been cross-examined about those other charges as they related to his credibility. So I think, again, I'm representing, based on that conversation, I think that that may be the reason why this admittedly unusual colloquy was prompted.  Thank you. Thank you. Counsel? Your Honor, I have to agree also. It's very unusual for the prosecution to be so worried about a defendant testifying for himself. See? Prosecutors often do things to perfect a trial record so that when the case goes up on appeal, they're not vulnerable. It's easy to see that this might have happened in this case. Again, you have to see also that... And defense counsel didn't object? Defense counsel objected so many times to... There was no objection to this, and there's no contention, is there, that the district court said anything wrong? Perhaps it's not wrong. Perhaps it's just how many times. And I could see the attorney, the defense attorney, that he could not get anything through, that they just sat there for 14 days showing one form after the other, one thing after the other, and the defense counsel... You haven't even claimed on appeal that those evidentiary rulings were in error. I believe I did about three of them, four of threes, that it was accumulative, that it was prejudicial to the defendant, and the judge just allowed it. Okay, thank you.